David R. Ehrlich (de-9786)
Amanda B. Slutsky (as-5655634)
Stagg Wabnik Law Group LLP
401 Franklin Avenue, Ste. 300
Garden City, New York 11530
(516) 812-4550
dehrlich@staggwabnik.com
aslutsky@staggwabnik.com

*Attorneys for Plaintiff*
*Lisa Lopez*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
LISA LOPEZ                                      Docket No.:

                    Plaintiff,
                                                                 **COMPLAINT**

      -against-

                                                                **JURY TRIAL**
SOUTH NASSAU COMMUNITIES HOSPITAL, INC.   **DEMANDED**
d/b/a MOUNT SINAI SOUTH NASSAU

                    Defendants.
-------------------------------------------------------------------x

      Plaintiff Lisa Lopez ("Plaintiff"), by her attorneys, Stagg Wabnik Law Group LLP, complaining of Defendant Mount Sinai South Nassau ("Defendant") herein alleges as follows:

## NATURE OF THE ACTION

      1.     Plaintiff was a dedicated registered nurse at Defendant's hospital for years until she was constructively discharged based upon her race and disability and for Defendant's blatant interference with Plaintiff's rights pursuant to the Family and Medical Leave Act ("FMLA"). Plaintiff brings this action against Defendant for discrimination and retaliation in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.* and FMLA and its accompanying regulations. Defendant's conduct was willful and showed a reckless disregard

of Plaintiff's rights, which caused and continues to cause Plaintiff to suffer substantial economic and noneconomic damages, including severe mental anguish and emotional distress.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action under 28 U.S.C. § 1331, as Plaintiff claims violation of the Family and Medical Leave Act, a federal statute.

3. Pursuant to 28 U.S.C. § 1367, this Court has jurisdiction over the New York State claims by way of supplemental jurisdiction.

4. Venue is proper in this District pursuant to Title 28 U.S.C. § 1391(b) and (c) as Plaintiff's claims arose within this District.

## PARTIES

5. Plaintiff is an individual residing in Queens County in the State of New York, and is employed by Defendant as a nurse.

6. At all relevant times herein, Defendant is a not-for-profit corporation duly organized under the laws of the State of New York.

7. Defendant owns and operates a hospital under the name Mount Sinai South Nassau (the "Hospital") in Oceanside, New York.

## STATEMENT OF FACTS

8. In or around 2010, Defendant hired Plaintiff as a Registered Nurse. Plaintiff worked as a nurse for Defendant from 2010-2013. During her three-year tenure, Plaintiff was an excellent performer, and left for personal reasons.

9. Plaintiff returned to the Hospital in or around 2017 to continue her role as a Registered Nurse. Plaintiff worked in the Hospital's Labor and Delivery department.

10. Upon Plaintiff's return to the Hospital, she observed a change in the culture at the Hospital. It quickly became clear that Defendant maintained a pattern and practice of condoning discriminatory comments and dangerous behavior that left Plaintiff and other Black nurses victim to old and offensive stereotypes based upon their race.

11. Ruth Watson ("Watson"), who is Caucasian, is employed by Defendant as a Registered Nurse in the same Labor and Delivery department as Plaintiff. Watson was the mouthpiece that Defendant used to perpetuate discriminatory statements and reinforce a racist culture. As Plaintiff would soon learn, her and her fellow Black nurses' complaints about Watson would go unremedied.

12. For example, in or about 2018, Watson made a joke to a Black nurse about the Underground Railroad and slavery (the "Slavery comment"). Watson's comments and "jokes" were always directed to a particular race and made with the reckless disregard for the offensiveness of the comments.

13. Further, in or around 2018, Watson commented to a pregnant Black surgical tech, who worked with Plaintiff and Watson at the Hospital, that to induce labor, she and her husband should have sex in the stairwell "like monkeys."

14. On another occasion, in or about 2019 (but not earlier than January 2019), Watson, when speaking to Plaintiff and other Black nurses, commented about how the pillowcases would be great for Ku Klux Klan members, who are known to wear white hoods and historically engaged in violent lynchings and assaults on Black people (the "KKK comment").

15. Additionally, in or about 2019 (but not earlier than January 2019), on several occasions, when there was a Black patient giving birth, Watson would ask Plaintiff and other Black nurses "how many Baby Daddies" do this person has (the "Baby Daddies comment"). In

fact, upon information and belief, Watson continues to make the Baby Daddies comments to this day.

16. Another time, there was a patient room that was extremely warm, and Watson commented that the room was as "hot as an oven in Auschwitz" (the "Auschwitz comment"). It was clear Watson had a discriminatory and racist mentality with absolutely no regard of the impact of her statements.

17. Plaintiff made a separate complaint to her supervisor Lynn Bert ("Bert") for each of the four comments made by Watson referenced above. Plaintiff also complained to Evelyn Lypnik ("Lypnik"), the nighttime supervisor, about the KKK, Slavery and Baby Daddies comments. Plaintiff further raised the issue of Watson's comments with additional supervisors Elena Lobatch ("Lobatch"), the Director of Nursing, and Eileen Skehan ("Skehan"), the Assistant Nurse Manager. In fact, when Plaintiff complained about Watson's discriminatory comments, Plaintiff also complained that Watson was a danger to her patients. This complaint of Watson's inability to follow the proper standard of care was never investigated.

18. As to the Slavery, Baby Daddies and Auschwitz comments, Defendant failed to investigate the complaints or address Watson about her discriminatory and offensive comments.

19. When Plaintiff complained to Skehan about Watson's comment regarding the Ku Klux Klan, Skehan emailed Defendants' Human Resources Department. This angered Bert who did not want Plaintiff's complaints documented and made it known to Human Resources, as she hoped Skehan, like Bert, would sweep the racism under the rug.

20. The email by Skehan to Human Resources appeared to have resulted in some sort of investigation. Upon information and belief, someone spoke to Watson about her racist and offensive comments, but no disciplinary measures were taken against Watson. In fact, when

Defendant reported back to Plaintiff about the investigation, Lobatch and Bert simply called Watson "quirky," and Bert suggested that Plaintiff may be the problem. It was abundantly clear to Plaintiff that Defendant was perfectly fine with Watson's conduct, and completely dismissed Plaintiff and her Black colleagues.

21. The lack of corrective action taken towards Watson just further signaled to Plaintiff and the Black employees that they do not matter. Defendant's lack of inaction reinforced the tired stereotypes infused in Watson comments and signaled that making such comments was acceptable and not a serious issue.

22. After seeing how Defendant handled her previous complaints about Watson, including blaming Plaintiff for making the complaints, Plaintiff believed it was futile to make other complaints about Watson's conduct. Plaintiff, for the moment, felt that she had no choice but to deal with the racist culture at the Hospital.

23. The discrimination and racism reared its ugly head again in 2021 when Plaintiff suffered from workplace injuries and needed time off to recover.

24. Prior to Defendant's continued discrimination and retaliation, in or around November 2020, Plaintiff received an excellent performance review conducted by Patricia Bartels ("Bartels"), who noted Plaintiff's performance was exemplary and did not raise any issues with her sick time.

25. In or about February 2021, Bartels discharged a Black nurse for absences and Plaintiff told a colleague that it appeared that the discharge was based on race, as other white nurses who called in sick or had absences were not subject to discharge. It turned out that the discharge of the Black nurse was improper and was reversed, although the employee ultimately chose to resign. Upon information and belief, Bartels was told that Plaintiff was upset about the

improper discharge of the Black nurse and believed that such nurse was targeted because she was Black.

26. Also, in or about February 2021, Bartels began going after Plaintiff for absences. Plaintiff had hurt her knee and back at work, and reported such injuries to the Hospital. As a result of her injuries, she occasionally had to take a sick day. Anytime Bartels or another Hospital employee asked for a doctor's note, Plaintiff always provided one. It was never an issue until in or around February 2021, when Bartels issued Plaintiff a negative performance review for her absences.

27. Shortly thereafter, Bartels wrote Plaintiff up again and issued a "final written warning" based on absences related to her workplace injury. Similarly situated white nurses who were absent due to workplace injuries did not receive such write-ups. Bartels was punishing Plaintiff for speaking up about the discriminatory discharge of the aforementioned Black nurse and treating her differently than the white nurses. Plaintiff was targeted because she was Black and spoke up about issues of race.

28. Bartels writeups also violated the laws prohibiting discrimination against those with disabilities, as the Hospital was required to provide reasonable accommodations, *i.e.*, time off for an injury or medical condition, for Plaintiff due to her workplace injuries.

29. The warnings Plaintiff got from Bartels for purported excessive sick time were never given to white employees. In fact, several white nurses missed more days than Plaintiff for physical injuries yet were never written up like Plaintiff was.

30. On or about July 20, 2021, Plaintiff woke up and could not move her neck and shoulder. She reported her condition to Bartels that day as Plaintiff could not report to work.

31. Plaintiff went to a doctor who informed her that she may have a tear in a muscle in her shoulder area. Two days later, on or about July 22, 2021, Plaintiff reported the development on her shoulder injury to Bartels. Between July 20 and 22, 2021, Plaintiff called the Hospital's Human Resources department several times to request information and paperwork so she could file for leave under the FMLA. Plaintiff left numerous voice messages that ultimately went unanswered.

32. On or about July 27, 2021, Plaintiff received an MRI on her shoulder and called Bartels to keep her apprised of her medical condition and treatment — (Plaintiff ultimately was diagnosed with a partial tear in one of her shoulder muscles). Bartels asked Plaintiff if she applied for FMLA leave. Plaintiff responded that she has been trying to file for FMLA leave and left numerous messages with the leave coordinator, but no one returned her calls or sent her the FMLA paperwork.

33. While Plaintiff was seeking medical treatment and trying to get the FMLA paperwork, Defendant, through Bartels and Human Resources Direct Mary Golden ("Golden"), discharged her based upon purported excessive absences. Although Bartels was fully aware of Plaintiff's medical condition regarding her shoulder, her intention to file for leave pursuant to the FMLA, and her efforts in trying to file for such leave, she worked with Golden to effectuate Plaintiff's discharge.

34. Plaintiff was not informed of her discharge until on or about August 2, 2021 when she contacted Bartels to update her on her condition. Bartels stated she could not talk. Bartels called Plaintiff back later that day with Lobatch on the call. Plaintiff informed them both that she had a partial tear of her rotator cuff and was deciding between physical therapy and surgery. On

this call, Bartels and Lobatch told Plaintiff that Defendant decided to discharge her based upon excessive absences.

35. Strangely, Plaintiff thereafter received a termination letter from Golden, dated July 30, 2021, that Plaintiff was discharged effective July 19, 2021 and her medical benefits will terminate on July 31, 2021.

36. On or about August 3, 2021, Plaintiff emailed Golden regarding her discharge and told Golden that it was illegal to discharge someone for absences when such person was in the middle of applying for FMLA. Because Plaintiff had the wherewithal and courage to call out Defendant for their illegal acts, Defendant, knowing that what they did was illegal, told Plaintiff that she would be reinstated. Golden blamed Defendant's illegal actions on the Hospital's incompetency in processing the FMLA leave request, but that is being way too kind. Bartels, who was instrumental in discharging Plaintiff, knew that Plaintiff's absences were based on an injury and that she was in the middle of applying for medical leave. Upon information and belief, Bartels told Golden about Plaintiff's injury situation and intention to file for medical leave, and yet Defendant still discharged Plaintiff.

37. Although Plaintiff was told that she was reinstated, the Hospital still failed to log into her work email, as her account remained locked.

38. Based on the Hospital's tacit approval of racist comments being made, Bartels' targeting of Plaintiff and other Black nurses based on race, and its attempt to illegal discharge Plaintiff because of her race and in violation of the disability law and FMLA, Plaintiff had had enough. She was despondent, overwhelmed with emotion — fear, anger, sadness. She felt helpless and hopeless. Given the Hospital's conduct, including her immediate supervisor Bartels,

8

Plaintiff had no choice but to resign her employment. Based on all of the racist incidents and illegal activity of the Hospital, Plaintiff was constructively discharged.

39. Plaintiff saw the Hospital for what it was—a place that allowed racism to flourish and Black employees to be targeted and treated less well than white employees. For example, in the approximately two years Bartels has worked for Defendant, Bartels discharged three employees, including Plaintiff, all of whom were Black. Two of those terminations were reversed, including Plaintiff.

40. The Hospital's overtly illegal action of discharging Plaintiff when she had suffered an injury and was applying for FMLA leave, happened because Plaintiff was Black. Defendant through Bartels tried to discharge Plaintiff illegally, and only because Plaintiff knew of her rights did the Hospital change course. No white nurses ever had to go through something like this. The white nurses were able to call in sick for illnesses and injuries without incident. Plaintiff and the Black nurses had to deal with write-ups, discipline and termination of their employment.

41. Based on the above, Defendant violated the laws prohibiting discrimination based on race and disability, and the FMLA for retaliating and interfering with her assertion of rights under that law.

## AS AND FOR A FIRST CAUSE OF ACTION
### (FMLA Interference)

42. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if set forth herein fully at length.

43. The FMLA entitles eligible employees of covered employers to take unpaid, job-protected medical leave for specified medical reasons for up to twelve weeks per year with

9

continuation of group health insurance coverage under the same terms and conditions as if the employee had not taken leave.

44. Code of Federal Regulations Section 825.301(c) states "when an employee provides notice of the need for FMLA leave, the employer shall provide the employee with notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations."

45. Plaintiff was disabled in that she hurt her neck and shoulder. Plaintiff was subsequently diagnosed with a tear in the muscle in her shoulder area. As a result of the tear in her shoulder, Plaintiff was in excruciating amounts of pain and it was difficult for her to perform some of the requirements of her job as nurse.

46. Plaintiff was able to successfully perform all the essential functions of her job as nurse, but simply needed time off to allow her injury to heal properly.

47. Defendant was an employer covered under the FMLA, and Plaintiff was eligible for up to twelve weeks of unpaid leave to recover from the tear in her shoulder.

48. Defendant knew that Plaintiff suffered a serious injury to her shoulder and that she needed a medical leave to recover from that injury.

49. Although Defendant knew that Plaintiff suffered a serious injury to her shoulder and could not work for a period of time, Defendant failed to offer Plaintiff leave under the FMLA or even notify Plaintiff of her rights under the FMLA.

50. Plaintiff contacted the Hospital's leave coordinator to request leave under the FMLA, but her calls were ignored.

51. Instead, even though Defendant, including Bartels, knew of Plaintiff's injury and attempts to submit papers for FMLA leave, Defendants interfered with that request by ignoring her calls and discharging her because she had called in sick.

52. Had Defendant offered Plaintiff FMLA leave, notified her of her rights under the FMLA, or even return her calls, there would have been no discharge for alleged excessive absences.

53. Because Defendant failed to offer Plaintiff FMLA leave or provide Plaintiff notice of her FMLA rights, and instead ignored her repeated calls about the leave and discharged her while applying for such leave, Plaintiff was deprived of her right to such leave and Defendant's actions constituted interference with Plaintiff's FMLA rights.

54. Defendant's actions violate the FMLA and Code of Federal Regulations §§ 825.301(a) and (c), and as a result of the violations, Plaintiff was not granted leave and was discharged from her employment.

55. Due to the egregious and malicious nature of Defendant's actions, Plaintiff is entitled to an award of punitive damages.

56. Because Defendant violated the FMLA and Code of Federal Regulations, Plaintiff is entitled to attorney's fees and costs.

### AS AND FOR A SECOND CAUSE OF ACTION
### (FMLA Retaliation)

57. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if set forth herein fully at length.

58. Plaintiff engaged in statutorily protected activity when she repeatedly called Defendant's Human Resources personnel to apply for FMLA leave, and when Plaintiff subsequently informed Bartels of her condition and that she was trying to apply for FMLA leave.

59. Following Plaintiff's exercise of rights protected by the FMLA, including but not limited her unanswered/unreturned calls to Defendant's Human Resources department and notification to Bartels of her intention to take a leave, Defendant retaliated against Plaintiff by discharging her in violation of the FMLA's anti-retaliation provisions.

60. Only after Plaintiff challenged the Hospital's illegal conduct and called it out for the illegal discharge did the Hospital tell her that she would be reinstated. Bartels, who was instrumental in making the decision to discharge Plaintiff, knew that Plaintiff was injured and seeking FMLA leave, yet still discharged Plaintiff. Upon information and belief, Bartels was not disciplined for discharging Plaintiff in clear violation of the law.

61. As a direct and proximate result of Defendant's unlawful conduct in violation of the FMLA, Plaintiff was constructively discharged, suffered monetary losses, and experience extreme emotional distress for which she is entitled to an award of monetary damages and other relief in amounts to be determined at trial. Plaintiff is also entitled to punitive damages for Defendant's overt and deliberate illegal conduct and attorney's fees.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Race Discrimination in Violation of New York Executive Law § 296 *et seq.*)**

62. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if set forth herein fully at length.

63. Executive Law § 296(1)(a) provide that: "It shall be an unlawful discriminatory practice for an employer…because of an individual's race…to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

64. Plaintiff is Black.

65. Defendant discharged Plaintiff on or about July 30, 2021 because she was Black.

66. Defendant ignored and failed to remedy the situation of a white employee, Watson, making racist comments and promoting offensive stereotypes of Black people.

67. Defendant was wholly apathetic to the discrimination and harassment perpetuated by Watson, and never took any corrective action toward Watson. Defendant simply called Watson "quirky" and suggested that Plaintiff was the problem.

68. Defendant then targeted Plaintiff because she was Black for her absences related to workplace injuries. Defendant wrote up Plaintiff for absences due to a workplace injury, whereas it did not do that for similarly situated white nurses. The white nurses were permitted to take days off and leaves for workplace injuries without consequence.

69. Defendant discharged Plaintiff on or about July 30, 2021, claiming she had too many absences, but did not discharge similarly situated white nurses.

70. The actions of Defendant of discharging Plaintiff for absences, even though its managers knew that Plaintiff was injured and applying for FMLA leave, only occurred to Plaintiff because she was Black.

71. Based on the above, Defendant treated Plaintiff less well than the similarly situated white nurses because Plaintiff was Black.

72. The actions by Defendant in discharging Plaintiff because she is Black violates Executive Law § 296.

73. As a direct and proximate result of Defendant's race discrimination in violation of Executive Law § 296, Plaintiff suffered and continues to suffer monetary losses, including but not limited to, loss of past and future income, compensation and benefits, for which is entitled to an award of monetary damages.

74. As a direct and proximate result of Defendant's race discrimination in violation of Executive Law § 296, Plaintiff suffered, and continues to suffer severe, mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages.

75. Plaintiff is entitled to attorney's fees and costs, and because Defendant's actions were willful and wanton, Plaintiff is also entitled to punitive damages.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Disability Discrimination in Violation of Executive Law § 296 *et seq*.)**

76. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if set forth herein fully at length.

77. Executive Law § 296(1)(a) provide that: "It shall be an unlawful discriminatory practice for an employer…because of an individual's…disability …to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

78. Plaintiff is disabled in that she has knee and back issues from work related injuries, but was a qualified employee and able to perform essential functions of her job with reasonable accommodations such as limiting standing time, not lifting patients and machinery over a certain weight, and taking time off to recuperate from her injuries and/or receive treatment.

79. Plaintiff informed Defendant of her disability, and need for an accommodation, i.e., an occasional day off when the pain was severe. Defendants failed to provide Plaintiff with such accommodations and instead reprimanded her for taking days off.

80. In August 2021, Plaintiff had a partial tear of her rotator cuff and informed Defendant of the injury. She informed her immediate supervisor of her need to take leave because of the injury.

81. Plaintiff was entitled to the accommodation of a leave of absence to recuperate and heal. Defendant not only denied Plaintiff the accommodation, but discharged her.

82. Defendant's action of denying Plaintiff an accommodation and discharging her because of her injury and need for an accommodation, violates Executive Law § 296(1).

83. Even though Defendant told Plaintiff that it would reinstate her after Plaintiff complained about Defendant's illegal action, Plaintiff was so appalled and upset at Defendant's crass and discriminatory conduct that she could not go back to work at the Hospital.

84. As a result, Plaintiff was constructively discharged, as she had no choice but to resign her employment due to the overt and deliberate discriminatory acts of Defendant.

85. Defendant discharged Plaintiff because of her disabilities in violation of Executive Law § 296(1).

86. As a direct and proximate result of Defendant's unlawful and discriminatory actions in violation of Executive Law § 296(1), Plaintiff suffered, and continues to suffer, monetary losses, including but not limited to, loss of past and future income, compensation and benefits, for which is entitled to an award of monetary damages.

87. As a direct and proximate result of Defendant's race discrimination in violation of Executive Law § 296, Plaintiff suffered, and continues to suffer severe, mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages.

88. Plaintiff is entitled to attorney's fees and costs, and because Defendant's actions were willful and wanton, Plaintiff is also entitled to punitive damages.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Hostile Work Environment in Violation of Executive Law § 296 *et seq.*)**

89. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if set forth herein fully at length.

90. Executive Law § 296(1)(h) provides that: "It shall be an unlawful discriminatory practice…for any employer…to subject an individual to harassment because of race…regardless of whether such harassment would be considered severe or pervasive…such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions of privileges or employment because of the individual's membership in one or more of these protected categories…nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared…."

91. Defendant discriminated against Plaintiff on the basis of race in violation of Executive Law § 296(1)(h) through a pattern and practice of fostering, condoning, accepting, ratifying and otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive discrimination of Plaintiff.

92. Defendant created a hostile work environment for Plaintiff by intentionally ignoring Watson's harassing, embarrassing, humiliating, and discriminatory conduct toward Plaintiff, and by failing to remedy it when Plaintiff complained.

93. Defendant, through Watson, harassed Plaintiff as described above because of her race.

94. Defendant then targeted Plaintiff because she is Black by disciplining and discharging her based on absences related to a workplace injury and another injury. Defendant

did not discipline or discharge white nurses who called in sick or needed leave due to a physical injury.

95. Defendant's actions of condoning racist conduct, *e.g.*, Watson's comments, and deliberately targeting Plaintiff for discipline and discharge for absences related to an injury because she was Black, when no such discipline or discharge occurred to similarly situated white nurses, amounted to a hostile work environment based on race, and an environment in which Plaintiff and the Black employees were treated less well than the white employees.

96. Based on the hostile work environment condoned and created by Defendant, Plaintiff had no choice but to resign her employment (after Defendant told her that she would be reinstated) and accordingly, was constructively discharged.

97. Based on the foregoing, Defendant created a hostile work environment for Plaintiff because of her race, and treated her less well because of her race, in violation of Executive Law § 296(1)(h).

98. As a direct and proximate result of Defendant's harassment and hostile work environment in violation of Executive Law § 296(1)(h), Plaintiff suffered, and continues to suffer, monetary losses, including but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

99. As a direct and proximate result of Defendant's harassment and hostile work environment in violation of Executive Law § 296(1)(h), Plaintiff is entitled to punitive damages, plus attorneys' fees and costs.

**JURY DEMAND**

100. Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE,** Plaintiff respectfully request a judgment against Defendants:

A. Declaring that Defendant engaged in unlawful employment practices prohibited by the federal laws and the laws of the State of New York;

B. Awarding Plaintiff damages in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court that might otherwise have jurisdiction over this matter, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, past and future income, wages, compensation, seniority, pension losses, and other benefits of employment;

C. Awarding Plaintiff damages in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, emotional pain and suffering and other physical and mental injuries;

D. Awarding Plaintiff damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest;

E. Awarding Plaintiff punitive damages, in an amount to be determined at trial;

F. Awarding Plaintiff costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

G. Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: Garden City, New York
November 19, 2021

                                        Stagg Wabnik Law Group LLP

                                        By: /s/ David R. Ehrlich
                                              David R. Ehrlich (de-9786)
                                              Amanda B. Slutsky (as-5655634)
                                              *Attorneys for Plaintiff*
                                              *Lisa Lopez*
                                              401 Franklin Avenue, Suite 300
                                              Garden City, New York 11530
                                              (516) 812-4550

TO: South Nassau Communities Hospital
One Healthy Way
Oceanside, New York 11570